UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

Neil F.,[1]

        Plaintiff,

v.                                     Civil Action No. 4:21-cv-56

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

### REPORT AND RECOMMENDATION

Plaintiff Neil F. seeks judicial review of the Commissioner of Social Security's denial of his claim for disability benefits ("DIB") under the Social Security Act. Specifically, Plaintiff cites three errors. Plaintiff alleges that the Administrate Law Judge ("ALJ") improperly weighed the state agency consultants' opinion and a decision rendered by a prior ALJ. Pl.'s Mem. Law Supp. Mot. Summ. J. ("Pl.'s Mem.") (ECF No. 18, at 1). He also argues that the ALJ insufficiently supported her assessment of a treating physician's opinion, and that the record is insufficiently developed. Id. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

## I.   PROCEDURAL BACKGROUND

This case concerns two applications that Plaintiff filed.  On April 16, 2019, the ALJ issued an opinion denying Plaintiff's claim alleging disability from November 12, 2017, through the date of that decision (hereafter "2019 ALJ Decision").  (R. 77-90).  On April 1, 2020, the ALJ issued an opinion denying Plaintiff's claim alleging disability beginning May 10, 2019, through the date of that decision (hereafter "2020 ALJ Decision").  (R. 10-23).  Only the 2020 ALJ Decision is before this court for review.

### A.   The 2019 ALJ Decision Concerning Plaintiff's Claim for DIB and SSI.

On July 18, 2018, Plaintiff initially filed for DIB and supplemental social security income ("SSI").  (R. 77).  Plaintiff alleged disability beginning November 12, 2017, based on right and left knee surgery, degenerative disc disease ("DDD"), sleep apnea, nerve damage, neck pain, and back pain.  (R. 84).  The state agency denied his application initially and again upon reconsideration.  (R. 77).  Plaintiff then requested an administrative hearing, which was held via remote videoconferencing on February 15, 2019.  Id.

On April 16, 2019, ALJ William Pflugrath ("ALJ Pflugrath") denied Plaintiff's claims for DIB and SSI, finding he was not disabled during the period alleged.  (R. 90).  The ALJ found that Plaintiff had several severe impairments: dysfunction of major joints; DDD; osteoarthritis; and neuropathy.  (R. 80).  However, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, with various limitations.  (R. 84).  Plaintiff did not file any federal court action to contest the decision.

### B.   The 2020 ALJ Decision Concerning Plaintiff's Claim for DIB.

On July 12, 2019, Plaintiff again filed for DIB.  (R. 10).  Plaintiff alleged disability beginning the same date as the prior application, November 12, 2017.  Id.  He alleged disability

based on radiculopathy, sciatica, osteoarthritis of the knee, and knee surgery for a torn meniscus. (R. 96-97). Plaintiff requested a hearing, which was held on February 25, 2020. (R. 10). He amended his alleged onset date to May 10, 2019. Id.

On April 1, 2020, a second ALJ, Maryann S. Bright ("ALJ Bright"), found that Plaintiff was not disabled under the Social Security Act. (R. 23). She found that Plaintiff had the following severe impairments: DDD; foraminal stenosis of cervical region; cervical spondylosis with radiculopathy; osteoarthritis of the bilateral knees; and fibromyalgia syndrome. (R. 13). However, the ALJ found that Plaintiff had the RFC to perform sedentary work, with various physical limitations. (R. 16). In making these findings, the ALJ stated that she

> considered the findings of Administrative Law Judge Pflugrath because the previously adjudicated period is close in time to the period now being adjudicated. . . . The undersigned gives these findings significant weight because there is no evidence since that decision to support significant changes. The claimant underwent surgery after the decision but the follow-up notes show only improvement in the left arm pain, so the residual functional capacity from the prior decision gives him the benefit of the doubt regarding persistent left arm limitations. The recent medical evidence of record documents recurring radiculopathy in his left upper extremity.

(R. 20). The ALJ cited Albright v. Commissioner of Social Security Administration, 174 F.3d 473 (4th Cir. 1999), as controlling how much weight to give a prior administrative finding. Id. On June 9, 2020, the Appeals Council denied Plaintiff's request for review. (R. 1).

**C.    Plaintiff's Social Security Appeal in This Court.**

In this court, Plaintiff argues that remand is required because ALJ Bright improperly weighed the state agency consultants' opinion and the 2019 ALJ Decision. Pl.'s Mem. (ECF No. 18, at 1). He also argues that the ALJ insufficiently supported her assessment of a treating physician's opinion, and that the record is insufficiently developed. Id. The Commissioner disagrees with each of these points, arguing that the ALJ properly evaluated the prior medical findings, the 2019 ALJ Decision, and the treating physician's opinion, and that the record

3

contained sufficient evidence of Plaintiff's impairment.  Def.'s Mem. Supp. Def.'s Mot. Summ. J. ("Def.'s Opp'n") (ECF No. 21, at 15).  After a review of the record, this Report considers each of these arguments.

## II.   FACTUAL BACKGROUND

Plaintiff was born on August 24, 1968, and at the time of the onset alleged in the 2020 ALJ Decision, he was 50 years old. (R. 21).  Plaintiff meets the insured status requirements under the Social Security Act until December 31, 2022. (R. 10).  He has not engaged in substantial gainful activity since May 10, 2019, the amended alleged onset date. (R. 13).  He has a high school education and has completed one year of college. (R. 306).  He has reported past relevant work as a cargo agent and a criminal investigator. (R. 21).

### A.   Relevant Medical and Treatment History

Plaintiff's arguments in this court do not require an extensive review of his medical history generally, only a review of the medical history concerning his knee impairments and neck impairment. See Pl.'s Mem. (ECF No. 18, at 9).

#### i.   Cervical Spine Impairment

In March 2019, magnetic resonance imaging ("MRI") showed multi-level DDD, with varying degrees of moderate to severe narrowing from C2-3 through C6-7. (R. 547-48).  The following month, Jackson B. Salvant, Jr., M.D., of Riverside Regional Medical Center ("Riverside"), performed an anterior cervical discectomy and fusion ("ACDF") at C5-6 and C6-7. (R. 531).  In July 2019, Plaintiff reported that his pre-operative left arm pain had resolved, but he still had posterior neck stiffness and pain, which was improving. (R. 550).

During a follow-up exam for Plaintiff's ACDF in September 2019, Laura E. Ripley, P.A. (Riverside), found that Plaintiff had "done very well post-operatively." (R. 1203).  There was "complete resolution [of] his neck and left arm pain." Id.  He was not experiencing any "numbness,

4

tingling, or weakness in the upper extremities." Id. A cervical x-ray showed stable fusion spanning C5 to C7, with good graft incorporation and minimal degenerative changes at C3-4 and C4-5. Id. He had intact upper extremity strength. (R. 1205). Dr. Ripley found him "essentially asymptomatic." Id. Dr. Salvant agreed that additional follow-up was unwarranted. Id.

In February 2020, Plaintiff reported to Cindy L. Kirkland, NP (Riverside), that he was experiencing a "gradual increase in neck pain" that had been ongoing for several months. (R. 1192). He reported numbness and tingling radiating from the neck into the left arm and to the wrist. Id. He did not have right upper extremity pain or difficulty with fine motor skills. Id. Plaintiff had full neck range of motion. (R. 1195). He had a mildly positive Spurling maneuver[2] on the left side. Id. He had normal strength but showed trace weakness of the deltoids and bicep of the left upper extremity. Id. He had a positive Tinel's sign[3] at the left elbow. Id. NP Kirkland recommended updated imaging with cervical x-rays and a short course of oral steroids followed by a daily anti-inflammatory. Id. She increased Plaintiff's gabapentin dosage and referred him for physical therapy and cervical traction. Id.

Plaintiff also treated with the Veteran Affairs ("VA") medical center in early 2020. (R. 1335). In January, Ginika Williams, P.A., found that Plaintiff had tenderness at C6-C7, and his neurological exam was intact. (R. 1341). P.A. Williams diagnosed cervicalgia and ordered a consultation with pain management, (R. 1343), and the following month, Mikiso Mizuki, Jr., M.D., evaluated Plaintiff for his neck pain, (R. 1331). Plaintiff "reported radiating pain into the left

---

[2] The Spurling test "evaluat[es] for cervical nerve root impairment" and "is considered positive when the maneuver elicits the typical radicular arm pain." Test, Spurling, Stedman's Medical Dictionary (27th ed. 2000).

[3] The Tinel sign "indicates a partial lesion or early regeneration in the nerve." Sign, Tinel, Stedman's Medical Dictionary (27th ed. 2000).

shoulder, triceps region." Id. He also reported "diffuse body pain" that "fe[lt] like nerves, muscles, [and] joints . . . ." Id. He said was experiencing 7/10 pain "presently," but 3-4/10 on average. (R. 1332). He reported using an airplane neck pillow to sleep, and only slept on average three to four hours a night. Id. He was not experiencing extremity weakness or paresthesia. Id. He exercised via elliptical twice a week for 30 minutes, and he curled a 25-pound dumbbell. Id. He was able to toe-touch three inches from the floor, and he had diffuse lumbar paraspinal tenderness. (R. 1333). Dr. Mizuki found Plaintiff to have 12/18 tender points for fibromyalgia, with that as Plaintiff's primary pain condition. Id. He did not find evidence of cervical or lumbar radiculopathy and did not recommend further invasive procedures. Id.

Later in February 2020, Raouf Gharbo, D.O., performed a nerve conduction velocity and electromyography exam, which showed "[c]lear signs of chronic left C6 radiculopathy." (R. 1281). Findings were less clear for C5 and C7. Id. Testing also showed very mild left median neuropathy at the carpal tunnel. Id.

### ii.    Bilateral Knee Impairment

Plaintiff underwent knee surgery before the relevant timeframe. See, e.g., (R. 1058) (reporting 2015 knee surgery). In October 2018, Plaintiff established care with John Barley, D.O. (Riverside). (R. 438). He complained of bilateral knee pain beginning several years earlier. (R. 439). Plaintiff reported worsening symptoms with activity, stair climbing, kneeling, deep knee bending, getting up from a chair, sleeping, weight bearing, and sitting for prolonged periods of time. Id. X-rays of both knees revealed moderate to severe tricompartmental osteoarthritis. (R. 441). Dr. Barley assessed Plaintiff with moderate to severe primary osteoarthritis bilaterally. Id.

Plaintiff returned to Dr. Barley in May 2019 for a six-month follow-up examination. (R. 399). He described pain with the same activities as before. Id. Plaintiff reported that "overall his

pain [was] doing moderately well," and he had "intermittent flares where it sometimes [did] worsen but overall for the most part he [was] well controlled." (R. 402). He could perform "all activities of daily living without any significant worsening of his symptoms." Id. X-rays showed moderate tricompartmental osteoarthritic change in both knees. Id. Among other findings, the right knee showed joint space narrowing, and the left knee showed probable cystic change involving the medial femoral condyle. Id. Dr. Barley found it appropriate to treat "conservatively" and recommended "anti-inflammatories as needed for pain control." Id. He assessed Plaintiff with moderate primary osteoarthritis bilaterally. Id.

Between September 2019 and October 2019, Plaintiff received three Euflexxa injections in his knees to alleviate his symptoms. (R. 1161-78). His physician had recommended three doses total. (R. 1164). He reported his pain at the first appointment as 7/10, (R. 1174), then at 4/10 for the next two injection appointments, (R. 1161, 1167).

In December 2019, Plaintiff sought treatment at the VA medical center for his knee pain, reporting his pain at 2/10. (R. 1358). He requested a refill of his ibuprofen prescription, which was forwarded to his provider for evaluation. Id. The examining nurse recommended that Plaintiff exercise regularly. Id.

Plaintiff returned to Dr. Barley in January 2020, when he reported that his pain was 7/10. (R. 1150). He said that the Euflexxa injections had not provided significant relief, id., and that the pain was affecting his quality of life, (R. 1154). His knee x-rays were largely the same as in May 2019. Id. The exam showed "focal pain due to his underlying osteoarthritis." Id. Dr. Barley again assessed Plaintiff with moderate to severe primary osteoarthritis bilaterally. Id. Dr. Barley discussed total knee arthroplasty with Plaintiff, but Plaintiff was "not yet ready to pursue" replacement, preferring to try all other treatment options first. (R. 1154-55). He was interested in

a plasma rich platelet ("PRP") injection. (R. 1155).  Dr. Barley recommended anti-inflammatories for pain control and home exercise.  Id.  In a letter dated that same day, Dr. Barley reported that "a knee replacement is eminate [sic]," and reported that PRP injections before surgery "could provide [Plaintiff] with some pain relief." (R. 1190).

In February 2020, Dr. Mizuki diagnosed Plaintiff with status post bilateral knee surgeries and recommended against further knee surgeries.  (R. 1333).

## B.    Opinion Evidence

Two consultants, Dr. Robert McGuffin and Dr. David Bristow, reviewed the record and assessed Plaintiff's limitations.   During the administrative proceedings, Plaintiff's treating physician, Dr. Barley, also completed a medical evaluation report.

### i.    Robert McGuffin, M.D.

Dr. McGuffin reviewed the record at the initial stage of review.  (R. 97).  He concluded that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. (R. 103).  He found that Plaintiff could stand or walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday.  Id.  Dr. McGuffin noted that Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, and crouch, but he could only occasionally climb ladders, ropes, and scaffolds, or crawl. (R. 104).  He recorded that Plaintiff had a normal range of motion, normal strength and muscle tone, and was coordinated.  Id.  He did not find any manipulative limitations.  Id.  He assigned Plaintiff light work.  (R. 105).

### ii.    David Bristow, M.D.

Dr. Bristow reviewed the record at the reconsideration stage.  (R. 118).  He found the same postural limitations as Dr. McGuffin, but he found some limitation with reaching overhead.  (R. 118-19).

8

### iii.   Dr. Barley

In February 2020, Dr. Barley completed a medical evaluation report. (R. 1285-87). Dr. Barley noted that "osteoarthritis of both knees" was causing Plaintiff's pain. (R. 1285). He opined that the pain would cause Plaintiff to lose focus for 50 percent of the workday and would cause Plaintiff to miss work three to four days a month. Id. Dr. Barley reported that Plaintiff could not sustain a full-time job. (R. 1286). He stated that Plaintiff could only sit for three hours a day and stand or walk for three hours a day. Id. Plaintiff could occasionally lift ten pounds. Id. While not noting a restriction on Plaintiff's right arm, Dr. Barley opined that Plaintiff could not use his left arm for grasping, pushing and pulling, and fine manipulation. Id. Neither foot could be used during the workday for repetitive movements. Id. Dr. Barley opined that Plaintiff would have no restriction with exposure to dust and fumes/gases, but a mild restriction with exposure to temperature and humidity, and moderate limitations with unprotected heights and proximity to moving machinery. (R. 1287). He opined that the impairment was expected last longer than twelve months and that "[t]he diagnosis is one that has no end date. There may be periods of time when the condition gets better, not total resolved." Id.

## B.   Testimony Before the ALJ

The ALJ questioned Plaintiff at the hearing on February 25, 2020. (R. 47-57). The ALJ also heard testimony from the VE, Linda Augins. (R. 65).

### 1.   Plaintiff's Testimony

Plaintiff testified that he was discharged from the military in November 2017 because of knee surgeries and knee and neck injuries. (R. 49-50). Plaintiff reported that he underwent knee surgeries in 2013 and 2014 and neck surgery in April 2019, but that pain persisted after those surgeries. (R. 52). He said he was in "constant" pain and did not believe his medication was

helping. (R. 53). He denied recent back treatment but had received a series of steroid injections in 2015 or 2016. (R. 53-54). The next step for his knee pain was knee replacement, but his doctor had recommended against replacement yet because he "was so young." (R. 54). He described wearing knee braces. (R. 55).

Plaintiff reported a typical day as driving his wife to work, using the computer at the library, and returning home to rest. Id. He testified that his wife occasionally helped him get dressed and with bathing. (R. 56). He said that he used to do most of the cooking, including grilling, but no longer did household chores. Id. He reported that he spent about half the day (four hours) in a recliner with his legs elevated. (R. 60-61). He stated that he had "almost immediate" pain from sitting with his legs at a ninety-degree angle. (R. 58).

In a function report Plaintiff completed on August 24, 2019, Plaintiff reported that he spent most of his time at home and did not participate in "much physical activity due to pain in [his] neck, knees and back." (R. 312). He lived in a house with his family. Id. He reported difficulty with personal care. (R. 313). He stated that he could do "some laundry, ironing [and] light sweeping," and found it difficult to stand and prepare meals, other than short ones. (R. 314). He shopped for food. (R. 315).

## 2.    Testimony from the VE

The ALJ's hypothetical for the VE posited a person with the same age, education, and work experience as Plaintiff who was

> limited to light exertion, with standing and walking four hours per eight-hour workday with normal breaks. Never climbing ladders, ropes, or scaffolds and never crawling. Occasionally climbing ramps and stairs. Occasional stooping, crouching, kneeling. Capable of frequent balancing. The individual can tolerate frequent exposure to vibration and hazards, such as unprotected heights and dangerous machinery. Limited to occasional reaching overhead. Capable of frequent fingering, that is fine manipulation with the left upper extremity. And frequent cervical rotation, turning head from left to right.

(R. 66-67). The VE testified that the hypothetical person would not be able to perform Plaintiff's past relevant work. (R. 67). However, the VE identified that there were transferable skills from Plaintiff's cargo agent position, including "transportation, knowledge of transportation, customer service, the ability to communicate, public safety and security, clerical skills, [and] sales and marketing skills." Id. The VE testified these skills would transfer to the light job of cargo checker (DOT 222.367-010) with 75,000 jobs nationally, and the sedentary job of cargo clerk (DOT 248.367-014) with 60,000 jobs nationally. Id. The VE also identified that there were transferable skills from Plaintiff's criminal investigation position, including "public safety and security, law and government, language skills, customer and personnel, personal service, clerical skills, administration and management." (R. 68). The VE testified these skills would transfer to the light job of sheriff's deputy (DOT 377.667-014) with 600,000 jobs nationally, but no skills would be transferrable to a sedentary position. (R. 68-69).

## III.   **STANDARD OF REVIEW**

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017). Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.   ANALYSIS

Plaintiff's brief identifies three errors in the ALJ's decision that he claims warrants remand. He contends that the ALJ's findings are unsupported by substantial evidence because she failed to weigh the state agency consultants' opinions and the 2019 ALJ Decision consistently; insufficiently supported her assessment of Dr. Barley's opinion; and did not develop the record adequately to support her finding of not disabled. Pl.'s Mem. (ECF No. 18, at 1). As explained below, this Report finds no error in the ALJ's analysis. The ALJ appropriately evaluated the state agency consultants' opinions and the 2019 ALJ Decision for consistency with recent medical evidence, and appropriately evaluated Dr. Barley's opinions in conformity with the controlling regulations. The record was also sufficiently developed to support the ALJ's RFC formulation. Accordingly, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

A.    **Framework for SSA Disability Evaluation**

Title XVI of the Act provides SSI benefits to "financially needy individuals who are aged,

blind, or disabled regardless of their insured status." Bowen v. Galbreath, 485 U.S. 74, 75 (1988)

(citing 42 U.S.C. 1382(a)).   As relevant here, the Act defines "disability" as the inability to

"engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than twelve months."   42 U.S.C. § 1382c(a)(3)(A));

accord 20 C.F.R. § 416.905(a).  An impairment renders an individual disabled only if it is so severe

as to prevent the person from engaging in his or her prior work or any other substantial gainful

activity that exists in the national economy.  See § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).

SSA regulations set out a sequential analysis which ALJs use to make their determination.

20 C.F.R. § 416.920(a)(4).  Specifically, the regulations direct the ALJ to answer the following

five questions:

1.    Is the individual involved in substantial gainful activity?

2.    Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3.    Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4.    Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5.    Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five,

means the claimant is not disabled.  An affirmative answer to questions three or five establishes

disability. The claimant bears the burden of proof during the first four steps. If the analysis reaches

step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled. 20 C.F.R. §§ 416.920(a)(3); 416.920b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age." Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)). Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ. Hays, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

## B.    The ALJ Decision Currently Before the Court for Review.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date. (R. 13). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: DDD; foraminal stenosis of cervical region; cervical spondylosis with radiculopathy; osteoarthritis of the bilateral knees; and fibromyalgia syndrome. Id. At step three, the ALJ found that Plaintiff did not suffer from a listed impairment or combinations of impairments that met or medically equaled the severity of one of the listed impairments. (R. 15). The ALJ developed a finding regarding Plaintiff's RFC. (R. 16). She determined Plaintiff was able

> to perform sedentary work as defined in 20 [C.F.R. §] 404.1567(a). Further, he can never climb ladders, ropes or scaffolds and never crawl or kneel. He can occasionally climb ramps and stairs, occasionally stoop, occasionally crouch, and occasionally balance. He can tolerate no more than occasional exposure to extreme heat, extreme cold, wetness, vibration, and hazards of operating dangerous vehicles and machinery and working around unprotected heights. He is limited to occasional reaching overhead, and is capable of frequent reaching in all other directions,

> frequent handling and frequent fingering and/or fine manipulation with his left
> upper extremity. He is capable of frequent cervical rotation (turning head from left
> to right).

(R. 16). At step four, the ALJ concluded that the Plaintiff was unable to perform past relevant

work but had acquired transferrable work skills, and that jobs existed in the national economy that

Plaintiff could perform. (R. 21). At step five, the ALJ ultimately found that Plaintiff was not

disabled. (R. 22).

**C.      The ALJ's Treatment of the Non-Examining Opinions and the 2019 ALJ Decision
         Was Not Inconsistent Because the ALJ Adequately Explained Her Reliance on the
         2019 ALJ Decision and Because Any Error Was Harmless.**

Plaintiff's first argument identifies a perceived inconsistency in ALJ Bright's treatment of

the state agency consultants' ("consultant") opinions and the 2019 ALJ Decision.[4] Pl.'s Mem.

(ECF No. 18, at 11-12). The contested opinions all found that Plaintiff was capable of light work,

but ALJ Bright determined that Plaintiff was only capable of sedentary work. (R. 16, 19-20).

Plaintiff's contention relies on the premise that, because the ALJ did not find "evidence since [the

2019 ALJ Decision] to support significant changes," the record did not support a reduction in

Plaintiff's exertional capacity from the 2019 ALJ Decision. (R. 20); Def.'s Opp'n (ECF No. 21,

at 20). Plaintiff thus argues it was contradictory for ALJ Bright to find the consultants' opinions

inconsistent "with the more recent medical evidence of record" that supported reduction. (R. 19);

Pl.'s Mem. (ECF No. 18, at 11-12). Essentially, Plaintiff argues that the ALJ identified evidence

supporting a reduction from light to sedentary work, but the ALJ incorrectly evaluated only the

consultants' opinions in light of that evidence without considering how it affected the earlier 2019

---

[4] Plaintiff has not challenged the sufficiency of the evidence supporting these opinions or identified specific
portions of these opinions that the ALJ should have adopted. See Pl.'s Mem. (ECF No. 18, at 11-12); Def.'s
Opp'n (ECF No. 21, at 18 n.12). Further, his argument makes the consultants' opinions relevant only to
show that the ALJ found recent medical evidence supporting a reduction from light to sedentary. Therefore,
it is unnecessary to review whether the ALJ's weighing of the opinions is supported by substantial evidence.

ALJ Decision. See Pl.'s Mem. (ECF No. 18, at 12) ("How then is there no evidence . . . to support significant changes?"). When read in context, the ALJ did not treat the opinions inconsistently, and her grant of "significant weight" to the 2019 ALJ Decision does not require remand. (R. 20).

As Defendant argues, "Plainly . . . [the ALJ] determined—contrary to ALJ Pflugrath—that Plaintiff should be limited to sedentary work, not light work," and thus she cannot have intended to adopt the 2019 ALJ Decision without any changes. Def.'s Opp'n (ECF No. 21, at 20). Substantial evidence supports ALJ Bright's finding that Plaintiff was only capable of sedentary work "[d]ue to the combination of neck and knee impairments . . . ." (R. 18). In early 2020—only a few months before the ALJ's decision—Plaintiff reported "diffuse body pain" that "fe[lt] like nerves, muscles, [and] joints," (R. 1331), and a nerve conduction velocity and electromyography exam ("nerve examination") showed clear signs of chronic left C6 radiculopathy, (R. 1281). Plaintiff reported that three Euflexxa injections for his knees had not provided significant relief. (R. 1150). He also testified that he no longer did household chores and spent half the day in recliner. (R. 56, 60-61). This recent evidence, along with other medical evidence within the record, substantially supports the ALJ's decision to reduce Plaintiff's exertional capacity to sedentary work. More importantly, however, this context clarifies that when ALJ Bright observed that recent evidence did not require "significant changes" to ALJ Pflugrath's "findings," she was not referring to his light work finding. (R. 20).

Instead, ALJ Bright thoroughly detailed specific RFC limitations to which she assigned weight and which did not require significant change. Id. ALJ Pflugrath found that Plaintiff was capable of frequent fingering with the left hand and frequent twisting of the cervical spine or head. id., and very similar limitations appear in ALJ Bright's RFC assessment, (R. 16). ALJ Bright adopted other RFC findings that ALJ Pflugrath imposed, such as limitations on reaching overhead.

(R. 16, 20). ALJ Bright also discussed the 2019 ALJ Decision's finding that Plaintiff was unable to perform past relevant work—which she also found. Id. Therefore, when read as a whole, ALJ Bright did give significant weight to specific RFC findings detailed in the 2019 ALJ Decision—but not necessarily to the assigned level of physical exertion in that decision. As such, her treatment of these opinions was not inconsistent.

Importantly, it is unclear what harm potentially resulted from this perceived inconsistency. While the 2019 ALJ Decision and the consultants' opinions each found that Plaintiff was capable of "light work," (R. 19-20), ALJ Bright ultimately found that Plaintiff could perform "sedentary work," (R. 16). Sedentary work is the most restricted category of physical exertion under the Social Security Act, while light work permits a greater physical capacity. 20 C.F.R. § 404.1567(a)-(b). "If someone can do light work, [the Act] determines that he or she can also do sedentary work . . . ." Id. § 404.1567(b). Therefore, the ALJ in this case restricted Plaintiff's capacity further than any of the contested opinions did. See (R. 16, 19-20). I will not stretch Plaintiff's argument as alleging that the ALJ should have found him capable of light work—the ALJ's opinion was considerably more favorable to Plaintiff than the 2019 ALJ Decision or the consultants' opinions. In fact, the ALJ discounted the state agency's opinions partly because she gave "some credit to [Plaintiff's] complaints of pain and mobility issues." (R. 16, 19-20). Furthermore, considering the later medical evidence, the ALJ would have arrived at this same conclusion even if the ALJ had accorded the 2019 ALJ Decision less weight or the consultants' opinions more weight.[5] See

---

[5] Plaintiff does not elaborate on the outcome if the ALJ had weighed the opinions differently. Pl.'s Reply (ECF No. 22, at 2) (arguing only that Defendant's "harmless error argument lacks merit"). But plaintiffs must do more than identify some isolated logical flaw or lack of clarity to win remand. See Shinseki v. Sanders, 556 U.S. 396, 409 (2009) ("The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

Ross v. Berryhill, No. 3:18-CV-42, 2019 WL 289101, at *12 (E.D. Va. Jan. 3, 2019) (discussing harmless error doctrine), adopted by 2019 WL 281191 (Jan. 22, 2019).

**D.    The ALJ Appropriately Weighed Dr. Barley's Opinion.**

Plaintiff argues that the ALJ improperly evaluated Dr. Barley's opinion evidence. Pl.'s Mem. (ECF No. 18, at 9). Dr. Barley—who treated Plaintiff for his bilateral knee osteoarthritis—opined that Plaintiff was incapable of even sedentary work, with other work-prohibitive limitations. (R. 19, 1285-87). The ALJ rejected Dr. Barley's opinion as "generally unpersuasive" because it was "not consistent" with the treatment record or Plaintiff's activities of daily living, (R. 19), which Plaintiff contends is error, Pl.'s Mem. (ECF No. 18, at 12). Because the ALJ appropriately evaluated Dr. Barley's opinion as required by the SSA rules,[6] remand is not required.

Under the rules, the ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) . . . ." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers their overall "persuasiveness," id., and while the ALJ may consider many factors in evaluating persuasiveness, he or she must explain only "the most important factors" of "supportability and consistency," id. § 404.1520c(b)(2). Plaintiff argues that the ALJ "admitted" that Dr. Barley's opinion was "supported by clinical observations, findings, and test results," and that "[t]his is a supportability factor favoring disability." Pl.'s Mem. (ECF No. 18, at 14) (quoting R. 19). However, the ALJ discounted Dr. Barley's opinion based on the other important factor—consistency.   (R. 19); see also 20 C.F.R. § 404.1520c(b)(2). Consistency influences "how persuasive" the medical opinion is. Id. § 404.1520c(b). The ALJ articulated two main bases under which Dr. Barley's opinion was not consistent with the medical

---

[6] On January 18, 2017, the SSA adopted new rules for considering medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c. The new rules apply to all claims filed after March 27, 2017. Id. Because Plaintiff filed his claim on July 12, 2019, (R. 10), the new rules apply.

record: his findings were "generally not consistent with the conservative treatment for the knees up to that point," and Plaintiff's "activities of daily living were more extensive than would be expected by someone with these opined limitations." (R. 19).  These consistency considerations are both supported by substantial evidence.

i.   **The ALJ's Finding That Plaintiff's Treatment Was "Conservative" Is Supported by Substantial Evidence.**

There is substantial evidence supporting the ALJ's finding that Dr. Barley's opinion was inconsistent with Plaintiff's conservative treatment.  Plaintiff contends that the ALJ failed to "directly illuminate" the inconsistency.  Pl.'s Mem. (ECF No. 18, at 12).  Under the regulations, an ALJ may consider a claimant's "treatment prescribed" as "[o]ther medical evidence" useful in evaluating a medical opinion.  20 C.F.R. § 404.1513(a)(3).  If a plaintiff requires only "conservative treatment, it is reasonable for an ALJ to find that the alleged disability is not as bad as the claimant says that it is." Dunn v. Colvin, 607 F. App'x 264, 274 (4th Cir. 2015).  The ALJ referred to Plaintiff's conservative treatment throughout her opinion. See, e.g., (18, 19).  She noted that Plaintiff's knee treatments "includ[ed] euflexxa injections," (R. 18), referring to Plaintiff's single cycle of three injections, (R. 1161-78).  The record also shows that Plaintiff was generally instructed to take anti-inflammatories "as needed" for pain management, (R. 402, 1155), and his physicians instructed him to exercise, (R. 1155, 1358).  This evidence supports the ALJ's finding that Dr. Barley's highly restrictive opinion was inconsistent with Plaintiff's treatment.

Plaintiff's failure to explore knee replacement is also significant.  The ALJ observed that Plaintiff "was not yet ready to pursue total knee arthroplasty." (R. 18).  Plaintiff implies that "proceeding to surgery early" was the only unpursued treatment option, and therefore treatment was aggressive under the circumstances.  Pl.'s Mem. (ECF No. 18, at 13); see also (R. 54) (testifying that his doctors "recommended against" replacement "because [he] was so young" and

"would probably need another one").  But the fact that Plaintiff's knee impairments were not sufficiently advanced to render surgery necessary despite his age supports the ALJ's finding that Plaintiff was not disabled.  When Dr. Barley explained total knee arthroplasty, Plaintiff expressed interest in a PRP injection instead.  (R. 1154-55).  In fact, Plaintiff stated that he would prefer "to try all other treatment options before going down this route."  Id. (emphasis added).  In February 2020, Dr. Mizuki recommended against further knee surgeries.  (R. 1333).  Even if knee replacement were eminent, see (R. 1190), the ALJ's finding that treatment "up to that point" was conservative is supported by substantial evidence, (R. 19).  Plaintiff also argues that "the ALJ did not adequately discuss" Plaintiff's surgery options, Pl.'s Reply (ECF No. 22, at 2), but the ALJ's reference to this clear record is more than adequate, (R. 18).

Lastly, Plaintiff argues that the ALJ should have articulated specific treatment that was missing—other than total knee arthroplasty—before finding that his treatment was conservative. Pl.'s Mem. (ECF No. 18, at 13).  He further implies that as a layperson, the ALJ was unqualified to characterize his treatment as conservative.  Id. at 12; cf. Lewis, 858 F.3d at 868-69 (directing district court to remand partly because ALJ improperly characterized plaintiff's extensive medical treatment as conservative).  However, the ALJ had available to her Dr. Barley's May 2019 treatment record, when he noted Plaintiff could be appropriately treated "conservatively."  (R. 402).  In January 2020, Dr. Barley recorded that Plaintiff was experiencing pain "despite conservative management with corticosteroid and viscosupplementation," which was Dr. Barley's last treatment notation during the relevant timeframe.  (R. 1154).  Thus, the ALJ did not characterize Plaintiff's treatment as conservative—the ALJ simply "adopted the characterization" assigned by Dr. Barley, Plaintiff's physician.  Annette S. v. Saul, No. 19 C 6518, 2021 WL 1946342, at *12 (N.D. Ill. May 14, 2021).  As such, it was unnecessary to specify unexplored

treatment option, and the ALJ's finding that Plaintiff's conservative treatment was inconsistent with Dr. Barley's opinion is supported by substantial evidence.

### ii.     The ALJ's Finding that Plaintiff's Activities of Daily Living Were "Extensive" Is Supported by Substantial Evidence.

The ALJ also considered the consistency between Dr. Barley's medical opinion and Plaintiff's activities of daily living, which "were more extensive than would be expected by someone with these opined limitations." (R. 19). The ALJ reviewed Plaintiff's activities of daily living thoroughly in her opinion,[7] noting that Plaintiff had problems with household chores but could "still prepare simple meals, do some laundry and ironing, and do some light sweeping, albeit taking longer than usual." (R. 18); see also (R. 314). He drove, shopped, and attended church. (R. 18, 315). On typical days, he went to the library and collected his grandson from the bus. (R. 18, 55). He reported an average pain of 3-4/10, but he could use the elliptical machine twice a week for 30 minutes and could perform curls with a 25-pound dumbbell. (R. 18-19, 1332). These activities support the ALJ's assessment of Dr. Barley's opinion.

Plaintiff contends that, despite these activities of daily living, the ALJ did not cite "activit[ies] indicative of [an] ability to perform work on a regular and continuing basis." Pl.'s Mem. (ECF No. 18, at 13). The Fourth Circuit has held that "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 101 (4th Cir. 2020) (quoting Bjornson v. Astrue, 671 F.3d 640, 647 (7th

---

[7] Plaintiff argues that the ALJ should have elaborated on the activities of daily living in the part of her decision that evaluated Dr. Barley's opinion. Pl.'s Reply (ECF No. 22, at 2). However, the ALJ's decision is considered as a whole, and the ALJ is not required to cite all applicable evidence in every portion of the opinion. Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir. 2011).

Cir. 2012)). Activities of daily living are useful to show the individual's ability to perform work-related activities. See SSR 16-3p, 2017 WL 5180304, at *11 (Oct. 25, 2017). However, in this case, Plaintiff's daily activities show that he was "ambulatory" and capable of performing a range of work activities. (R. 17). Further, considering the specific RFC limitations that "accommodate[d] his back and knee issues," (R. 20), and the assignment of sedentary work, (R. 16), Plaintiff's daily activities are directly relevant to his work ability.

Plaintiff identifies several daily activities as allegedly not inconsistent with Dr. Barley's opinion—specifically, Plaintiff's ability to drive and his exercises with the elliptical and dumbbell. Pl.'s Mem. (ECF No. 18, at 13-14). Plaintiff argues that these activities do not contradict Dr. Barley's limitations on the time Plaintiff could spend sitting, standing, or walking, or on the weight Plaintiff could lift. Id. However, "the ALJ did not dispute that he had some limitations as a result of his bilateral knee impairment." Def.'s Opp'n (ECF No. 21, at 23). The ALJ limited Plaintiff to sedentary work and adopted "the environmental limitations." (R. 19). As articulated above, sedentary work is the lowest level of physical exertion, and by definition "involves lifting no more than 10 pounds," 20 C.F.R. § 404.1567(a), which is the amount Dr. Barley opined that Plaintiff could lift, (R. 1286). Regarding Dr. Barley's limitations on how long Plaintiff could stand or walk, sedentary work only requires occasional "walk and standing . . . ." 20 C.F.R. § 404.1567(a). The ALJ also limited Plaintiff's reaching overhead with his left arm consistent with Dr. Barley's opinion, although without the same restrictions on manipulation. (R. 16, 1286). But importantly, while the ALJ acknowledged some of these limitations in the RFC, Plaintiff's daily activities demonstrate that other of Dr. Barley's opinions (for example, that pain would cause Plaintiff to lose focus for 50 percent of the workday) are inconsistent. (R. 1285). After recognizing the restrictions imposed in the RFC, Plaintiff's daily activities, read as a whole, support a finding that

Plaintiff was not as limited as Dr. Barley opined. <u>See</u> <u>Smith</u>, 457 F. App'x at 328. The ALJ's opinion that Plaintiff was not disabled is supported by substantial evidence.

**E.    The ALJ Properly Developed the Record Regarding Plaintiff's Neck Impairment, and the RFC Is Supported by Substantial Evidence.**

Plaintiff argues that the ALJ failed to properly analyze and develop the record on Plaintiff's neck impairment, and that as a result, the RFC she formulated was not supported by substantial evidence. Pl.'s Mem. (ECF No. 18, at 14). The Fourth Circuit has established that an ALJ "has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." <u>Cook v. Heckler</u>, 783 F.2d 1168, 1173 (4th Cir. 1986) (citations omitted). "The key consideration is 'whether the record contained sufficient medical evidence for the ALJ to make an informed decision' regarding the claimant's impairment." <u>Lehman v. Astrue</u>, 931 F. Supp. 2d 682, 692-93 (D. Md. 2013) (quoting <u>Craft v. Apfel</u>, No. 97-2551, 1998 WL 702296 (4th Cir. 1998); 20 C.F.R. § 416.912)) (internal parenthetical omitted). In this case, there was substantial evidence in the record to support the conclusion that Plaintiff was not disabled between his alleged onset date of May 10, 2019, and the date of the hearing, February 25, 2020.

The "ALJ is under no obligation to supplement an adequate record to correct deficiencies in a plaintiff's case." <u>Id.</u> at 693 (citing <u>Rice v. Chater</u>, No. 94-2001, 1995 WL 253134 (4th Cir. May 1, 1995)) (internal parenthetical omitted). The record was adequately developed regarding Plaintiff's neck impairment, which the ALJ discussed in detail. (R. 18). She noted that Plaintiff's left arm pain resolved after his ACDF surgery. <u>Id.</u>; <u>see also</u> (R. 550, 1203). Although in February 2020 Plaintiff reported a "gradual increase in neck pain" and some numbness and tingling sensations, (R. 1192), he had full range of motion, and his clinical signs involved only a mildly positive Spurling maneuver, a positive Tinel's sign, and trace weakness of the deltoids and bicep,

(R. 1195).   A nerve examination showed "[c]lear signs of chronic left C6 radiculopathy" and "[v]ery mild left median neuropathy at the carpal tunnel." (R. 1281).   After discussing this evidence, the ALJ noted that "the combination of neck and knee impairments" supported sedentary work, but that Plaintiff's improvement and mild objective findings did not require limitation to less frequent handling and reaching.   (R. 18).   Therefore, there "were no inadequacies or evidentiary gaps in the record for which the ALJ was obligated to develop the record." Collins v. Saul, No. 3:19-CV-00824, 2020 WL 4516855, at *10 (S.D. W. Va. July 17, 2020), adopted by 2020 WL 4508312 (Aug. 5, 2020).

Plaintiff's main contention surrounds a perceived lack of evidentiary clarity about whether he had cervical radiculopathy.   There are two February 2020 medical opinions relevant to this argument: Dr. Mitzuki's notation that there was "[n]o evidence of cervical or lumbar radiculopathy," (R. 1313), and the nerve examination showing "[c]lear signs of chronic left C6 radiculopathy" with less clear findings for C5 and C7, (R. 1281).   Plaintiff implies that this conflict—that is, that Dr. Mitzuki did not find evidence of radiculopathy while the nerve examination did—required the ALJ to further develop the record. Pl.'s Reply (ECF No. 22, at 2) ("Dr. Mizuki's apparent struggle with the facts supports obtaining a new opinion.").   But Dr. Mitzuki's single failure to find evidence of cervical radiculopathy does not undermine the ALJ's ability to rely on the weight of the remaining treatment record, including the later in date nerve examination.   The ALJ also assigned "cervical spondylosis with radiculopathy" as one of Plaintiff's severe impairments—she therefore granted Plaintiff the limitation he appears to seek in

his argument.[8] (R. 13). In fact, the ALJ noted that she "included a limitation on the movement of [Plaintiff's] neck in abundance of caution, given his history of treatment." (R. 18).

Plaintiff criticizes the ALJ's decision to give him "the benefit of the doubt" as "an [in]adequate substitute for development of the record with opinion evidence." Pl.'s Reply (ECF No. 22, at 2). He cites Cook v. Heckler as supporting his position, id., but in that case, the Fourth Circuit identified at least seven different categories of evidence that were missing from the record, Cook, 783 F.2d at 1173-74. Here, the ALJ had a clear history of improvement regarding Plaintiff's neck impairment and his returning pain, (R. 1192, 1203), and she noted that "[t]he recent medical evidence of record documents recurring radiculopathy in his left upper extremity," (R. 20), referring to the nerve examination, (R. 1281). The evidence available to the ALJ was more than sufficient to conclude that Plaintiff had cervical radiculopathy, and to assess the limitations it imposed. As the record is adequate to make an informed decision, the ALJ was not required to supplement Plaintiff's claims. See Bell, 1995 WL 347142, at *5; see also Loving v. Astrue, No. 3:11cv411, 2012 WL 4329283, at *10 (E.D. Va. Sept. 20, 2012).

Plaintiff also argues that "Dr. Mitzuki, a professional, struggled to reach a correct opinion without the objective evidence," and thus a layperson ALJ could not interpret the evidence correctly. Pl.'s Mem. (ECF No. 18, at 15). As Defendant articulates, "the fact that the ALJ was a layperson did not mean that she could not assess the medical evidence in crafting Plaintiff's RFC." Def.'s Opp'n (ECF No. 21, at 26). An RFC "is an administrative assessment made by the Commissioner based on all the relevant evidence in the case record." Felton, 459 F. App'x at 230-31 (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). Therefore, any "argument that the ALJ's finding

---

[8] Plaintiff alludes to his prior argument that "the ALJ was not clear on whether there was evidence of change after the" 2019 ALJ Decision. Pl.'s Mem. (ECF No. 18, at 15). However, for the reasons discussed above, this argument does not require remand. See supra.

is not supported by substantial evidence because the ALJ is a layman and did not obtain an expert medical opinion . . . is without merit." Id. at 230.

Plaintiff contends that the February 2020 EMG should have caused the ALJ to seek "clarification on the impact of the neck impairment in this case." Pl.'s Mem. (ECF No. 18, at 15). However, the ALJ is not required to "function as the claimant's substitute counsel . . . ." Bell, 1995 WL 347142 (quoting Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994)); see also Loving, 2012 WL 4329283, at *5. Plaintiff was represented by counsel during the hearing, (R. 44), and counsel from that same firm continues to represent Plaintiff on his case in this court, see Pl.'s Mem. (ECF No. 18, at 17). Further, the ALJ accorded Plaintiff an opportunity after the hearing to submit additional documents, (R. 45, 71-72), which Plaintiff did, (R. 1281-1439). Plaintiff has not indicated that there are specific follow-up appointments or other medical records regarding his neck impairment that the ALJ did not consider. See generally Pl.'s Mem. (ECF No. 18). The ALJ thus had a narrow duty to develop the record—made narrower by Plaintiff's representation—which was not triggered here.

Lastly, to reiterate, Plaintiff's neck impairment was accommodated in the RFC. The ALJ noted that she kept certain RFC limitations identified in the 2019 ALJ Decision, despite evidence of improvement, to accommodate any "persistent left arm limitations." (R. 20). She "included a limitation on the movement of [Plaintiff's] neck in abundance of caution, given his history of treatment." (R. 18). "The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki, 556 U.S. at 409. An error is significant if the result likely would have been different. Ross, 2019 WL 289101, at *12 (quoting id.). Although I do not find that an error has occurred here, as the ALJ's findings are supported by substantial

evidence, I do observe that Plaintiff has failed to show any way in which the result would have been different.

## F.      Reading Contentions in Concert Does Not Alter the Recommendation.

Lastly, Plaintiff argues that he "made all three points as part of a single argument for a reason. The ALJ's failures in assessing all opinions (and lack of further development) lead to the harm of the errors." Pl.'s Reply (ECF No. 22, at 1). Thus, Plaintiff advocates that his arguments should not be addressed in isolation. Id. However, reading all arguments as one argument does not demonstrably change the result. As discussed above, none of the three contentions are sufficient to warrant remand. Plaintiff has failed to articulate in his four-page reply how considering the arguments in concert could yield a different result. See id. Therefore, remand is not appropriate.

## V.      **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment (ECF No. 20), DENY Plaintiff's Motion for Summary Judgment (ECF No. 17), and AFFIRM the Commissioner's finding of no disability.

## VI.      **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with

a copy thereof.  See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.     A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
February 15, 2022